IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JESSICA ROBERTS,

       Plaintiff,

v.                                       No. CIV 13-995 RB/KBM

SAN MIGUEL CLINIC CORPORATION,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

      Plaintiff Jessica Roberts' contract with Defendant San Miguel Clinic Corporation was not renewed after she took leave due to complications with her pregnancy. Plaintiff sued for discrimination and violations of her rights under the Family Medical Leave Act. Defendant moved for summary judgment. (Doc. 45.) Having reviewed the parties' submissions and arguments, the Court **GRANTS** the motion in part and **REMANDS** the claim in part.

**I.    BACKGROUND**

      Plaintiff, an obstetrician/gynecologist, started working at the San Miguel Clinic in September 2005 after completing her residency. (Doc. 45 ¶ 1.) Plaintiff worked pursuant to written contracts which lasted from one to three years. (Doc. 45 ¶¶ 4-6.) Generally, Plaintiff's sister and lawyer, Brittany Fowlkes, negotiated the contracts with the Clinic's chief executive officer ("CEO"). (Doc. 45 ¶ 4, 6.) Several times, Plaintiff and the Clinic agreed to make extensions to the existing contract before negotiating a new one. (Doc. 45 ¶ 5, 7; Ex. 14, Doc. 49.)

      Although the parties may not have realized it at the time, the final extension they signed was on February 28, 2011. (Doc. 45 ¶ 8.) San Miguel's newest CEO, Maridel Acosta, signed

the extension. (*Id.*) She had become the CEO only two months prior. (*Id.*) The contract extension provided Plaintiff with a $375,000 base salary, $1,500 for license fees, and up to $33,333.33 in loan repayments. (Doc. 45-5 at 39.) By its terms, the contract extension expired on February 28, 2012. (Doc. 45 ¶ 8; Doc. 45-5 43.)

Plaintiff became pregnant with twins in 2011. (Doc. 45 ¶ 13.) On January 4, 2012, Plaintiff met with CEO Acosta to inform her that she was pregnant. (Doc. 45 ¶ 13.) She further told CEO Acosta that one of her twins was diagnosed *in utero* with a cardiac defect which would require Plaintiff to take bed rest. (Doc. 49 ¶ 3.) CEO Acosta said she already knew that Plaintiff was pregnant. (Doc. 49 ¶ 1.)

On January 13, 2012, CEO Acosta and the Chief Financial Officer, Leonard Tapia, met with Plaintiff to present her a renewal contract. (Doc. 45 ¶ 17.) The renewal contract was prepared in late 2011. (Doc. 45 ¶ 14.) The proposed renewal contract contained different terms than Plaintiff's previous contracts and was based on a new compensation structure. (Doc. 45 ¶ 17, 18.) The proposed contract reduced Plaintiff's annual base salary from $375,000 to $323,000 annually, tied her salary going forward to her performance, and eliminated her loan repayment. (Doc. 49 ¶¶ 10-11.) Finally, the proposed contract provided that Plaintiff's base salary would be reduced on a quarterly basis if she did not meet her target goals. (Doc. 49 ¶ 10.) Previous contract renewals resulted in pay increases, not decreases. (Doc. 49 at 2-3.)

Plaintiff requested Family Medical Leave Act ("FMLA") leave on January 27, 2012, due to complications with her pregnancy. (Doc. 45 ¶ 14; Doc. 49 ¶ 3.) FMLA provides up to twelve weeks of unpaid leave to eligible employees who need to take off time due to their own serious health conditions. 29 U.S.C. § 2612(a)(1). Based on her doctor's recommendation, Plaintiff started bed rest on January 30, 2012. (Doc. 45 ¶ 20.) On February 28, 2012, Plaintiff's contract

expired and she lost her employer-funded health care coverage. (Doc. 49 ¶ 17.) Her babies were born March 13, 2012. (Doc. 49 ¶ 15.) Both babies had extended hospital stays and one twin required multiple cardiac surgeries. (*Id.*)

In the meantime, Plaintiff forwarded the proposed renewal contract to Ms. Fowlkes to review sometime in January. (Doc. 45 ¶ 18.) On February 8, Ms. Fowlkes initiated contract negotiations. (Doc. 45 ¶ 14.) Fowlkes asked Defendant to sign an extension for Plaintiff's contract, but Defendant refused. (Doc. 45 ¶ 22.) Defendant refused the extension, arguing that the Clinic would not renew any contracts with the old physician compensation structure. (Doc. 45 ¶ 28.) Contract negotiations went back and forth for months. (Doc. 45 ¶¶ 21-28.) Defendant hired a replacement obstetrician on April 25, 2012. (Ex. 3, Doc. 49.) By July 2012, Plaintiff terminated her lawyer and started communicating directly with the Defendant. (Doc. 45 ¶ 35.) Defendant, through its lawyer, responded that the negotiations were over, that Plaintiff had rejected the offer, and she no longer had a contract with the Clinic. (Doc. 45 ¶ 37.) Plaintiff maintains that she did not reject the offer, but merely asked for different terms. (Doc. 49 at 5.) Counteroffers, however, have the same legal effect as rejections. Restatement (Second) of Contracts § 39 & cmt. a (1981) ("It is often said that a counter-offer is a rejection, and it does have the same effect in terminating the offeree's power of acceptance.").

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the New Mexico Human Rights Bureau on October 9, 2012. (Doc. 45 ¶ 40.) The New Mexico Human Rights Bureau found no probable cause and issued Plaintiff a right to appeal. (Ex. 6, Doc. 45-2.) On August 2, 2013, Plaintiff filed a complaint in New Mexico state court. (Doc. 1-2.) Defendant removed the action to this Court based on federal question jurisdiction. (Doc. 1 ¶ 3.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). If there is a genuine dispute of material fact, then the "facts must be viewed in the light most favorable to the nonmoving party . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III. DISCUSSION

Plaintiff originally brought four claims, two federal claims for FMLA violations and two state law claims for discrimination and wrongful termination.

### A. FMLA Violation Claims

Plaintiff claims that Defendant retaliated against her and interfered with her FMLA rights. Both are recognized theories under FMLA which "require different showings and differ with respect to the burden of proof." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). The key distinguishing factor, in the Tenth Circuit, is timing. A claim of retaliation under FMLA "may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work." *Id.* In contrast, an interference claim arises when an employer makes an adverse employment decision before the employee has been

allowed to take FMLA leave or while the employee is still on FMLA leave. *Id.* Because Plaintiff was never restored to her prior position, Plaintiff may not bring a retaliation claim, but she may bring an interference claim. *See Campbell*, 478 F.3d at 1287 (explaining that a denial of reinstatement following leave supports an interference claim, not a retaliation claim). Accordingly, the Court will construe all Plaintiff's factual allegations to support an interference claim.

Under FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [FMLA]." 29 U.S.C. § 2615(a)(1). An employer's interference with an employee's FMLA rights is a violation regardless of the employer's intent. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006). To establish a claim of FMLA interference, an employee must show (1) that she was entitled to FMLA leave, (2) that an adverse action interfered with her right to take FMLA leave, and (3) that the employer's action was related to her attempts to invoke FMLA protections. *Metzler*, 464 F.3d at 1180. The employer bears the burden of demonstrating that the adverse decision was not "related to the exercise or attempted exercise of the employee's FMLA rights." *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) (citing *Campbell*, 478 F.3d at 1287).

Plaintiff can easily establish the first two elements of her interference claim. First, the parties do not contest Plaintiff's eligibility for FMLA leave. Second, Plaintiff's contract, after five-and-a-half years of service, was not renewed while she was on leave. This was an adverse action that prevented her from taking the full twelve weeks of her leave and denied her reinstatement. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1282 (10th Cir. 2003)

5

(considering non-renewal of a contract to be an adverse action for an ADEA claim); *Campbell*, 478 F.3d at 1287 (denying reinstatement gives rise to an interference claim).

The issue here is the third element of interference: whether Defendant's decision to not renew Plaintiff's contract "was related to the exercise or attempted exercise of her FMLA rights." *See Campbell*, 478 F.3d at 1287. Defendant argues that its decision had nothing to do with Plaintiff's invocation of her FMLA rights. According to Defendant's version of the story, the parties "could not reach mutually agreeable [contract] terms" and the contract simply expired. (Doc. 45 at 23.)

Plaintiff admits that her prior contract had a set expiration date, that she was offered a renewal contract, and that the parties could not agree to terms before the contract's expiration. Plaintiff cannot complain that the terms of the contract were in response to her request for FMLA because she was handed the proposed renewal contract two weeks before she requested FMLA leave. (Doc. 49 at 6, 10.) Moreover, Plaintiff admits that the terms of the renewal contract were drafted before Plaintiff informed CEO Acosta of her babies' serious medical condition and her impending need for FMLA leave. (Doc. 45 ¶ 14; Doc. 49 ¶¶ 14, 3(PAMF)) Plaintiff argues only that the Defendant could have followed past practice and extended her contract. (Doc. 49 at 15.) Surely, Defendant could have extended the contract. However, nothing in the law required it to do so.

FMLA and its federal regulations make clear that employees are not entitled to greater employment rights because they take FMLA leave. 29 U.S.C.A. § 2614(a)(3)(B) (employees are not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave"); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits

and conditions of employment than if the employee had been continuously employed during the FMLA leave period."). In short, an employee whose employment ends while taking FMLA leave is not entitled to a contract extension because of the leave. *See Campbell*, 478 F.3d at 1289 ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request."). Significantly, Defendant offers a non-discriminatory reason for not extending the contract: the Clinic was in the midst of changing the compensation structure for all physicians and was unwilling to extend any contracts made under the old structure. (Doc. 53 at 8.)

Plaintiff's contract negotiations began before her request for FMLA and lasted long after. While the Court sympathizes with the difficult position the non-renewal put Plaintiff in, losing her employment and changing her health coverage in the midst of a difficult pregnancy, the Court is not "a 'super personnel department' that second guesses employers' business judgments." *Dalpiaz*, 760 F.3d at 1133-34 (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000)). Defendant made a strong showing that its actions were not related to Plaintiff's attempts to invoke FMLA protections. Plaintiff's arguments do not overcome Defendant's reasons. Because Plaintiff cannot support her claim of an FMLA violation, Defendants are entitled to summary judgment on those Counts.

### B. State Law Claims

Plaintiff withdrew her retaliatory termination claim recognizing that contractual employees may not bring such claims. (Doc. 49 at 2.) The Court dismisses this Count.

Plaintiff stated a prima facie case that the contract she was offered was discriminatory under state law. (Doc. 49 at 8.) However, the Court will not exercise its jurisdiction to decide

this claim when there is no longer any basis for federal jurisdiction. 28 U.S.C. § 1367(c)(3); *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) ("[I]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction . . . ."). Because this case originated in state court, Plaintiff's claim for discrimination should be remanded to the state court from whence it was removed.

## IV. CONCLUSION

Plaintiff is unable to support her claims that Defendant violated her rights under FMLA. The Court thus grants summary judgment on those claims. Plaintiff's remaining state law claim is remanded to state court.

**THEREFORE**,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** in part:

1) Count 1, Plaintiff's claim for discrimination under the New Mexico Human Rights Act, is **REMANDED** to state court;

2) Count 2, Plaintiff's claim for retaliatory termination, is **DISMISSED** with prejudice; and

3) Defendant's motion is **GRANTED** with respect to Counts 3 and 4, Plaintiff's claims for FMLA violations.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**